**Donald R. NICOLL and Marian J. Nicoll, Appellants,**

**v.**

**COMMUNITY STATE BANK, Appellees.**

No. 25A04–8711–CV–345.

Court of Appeals of Indiana, Fourth District.

Oct. 20, 1988.

Rehearing Denied Dec. 15, 1988.

John O. Worth, Julie A. Hughes, Worth Law Office, Rushville, for appellants.

Donald J. Tribbett, Walker Starr Austen & Tribbett, Logansport, for appellees.

MILLER, Judge.

On December 12, 1985, Community State Bank, Royal Center, Indiana [CSB], the appellee, brought suit against Donald R. Nicoll and Marian Nicoll, the appellants, on a promissory note [Personal Note] executed by Donald Nicoll and guaranteed by Marian Nicoll. The Nicoll's filed an answer and counter-claim which alleged CSB, in a separate transaction with the Nicolls, required them to purchase a hedging contract as security for a thirty thousand dollar [$30,000.00] note [Cattle Note] to finance the purchase of feeder cattle, and, as a result of the purchase of the hedging contract, the Nicolls lost more than ten thousand dollars ($10,000.00).

CSB filed a Motion for Summary Judgment on its complaint. After a hearing, the trial court granted the motion on August 1, 1986.[1] On August 15, 1986, CSB filed its Motion for Summary Judgment on Nicolls' counter-claim which was granted.

While the Nicolls' do not claim they were not in default on the Personal Note, they appeal the grant of summary judgment on both CSB's complaint and the counter-claim. We have rephrased the issues as follows:

---

1. The court failed to enter this judgment on August 1, 1986. On November 18, 1987, the court made the following entry:

"The Court is now made aware of the deficiencies in its entry of August 1, 1986. The Court notes its failure to make record at that time of documents received from Defendants Nicoll entitled Memorandum in Objection to Summary Judgment which the Court now shows of record as follows: (H.I.), and that further it made record entry of summary judgment which was not reduced to document form even though the entry reflects that the judgment was reduced to document form. The Court on that date granted the Summary Judgment request of Plaintiff, treating the set-off allegations of Defendants Nicoll as counter-claims. The said counter-claims were subsequently adjudicated by Court entry of Summary Judgment of 6-8-87.

The Court directs Clerk to accurately reflect the entry of 8-1-86 as it was then made and, at that point in the transcript of this proceeding, refer to this entry."

1. Whether the trial court erred in finding as a matter of law there was no fiduciary relationship between CSB and the Nicolls.

2. Whether the trial court erred in failing to consider if there were genuine issues of material fact concerning alleged negligent misrepresentations on the part of CSB.

3. Whether the trial court erred in granting summary judgment on CSB's complaint when there was a counterclaim in excess of CSB's complaint.

We affirm.

### FACTS

This case involves two promissory notes. On August 1, 1984, Donald Nicoll executed the Personal Note in the principle sum of $7,916.04, which was a renewal of a prior obligation. Marian Nicoll was obligated on the note under a continuing Guaranty Agreement which she executed on June 12, 1980. CSB's complaint was based on this note.

On October 25, 1982, the Nicolls and their landlords, T. Otto Nall and Frances Nall[2] executed the Cattle Note in the principle sum of thirty thousand dollars ($30,000.00), which was used to purchase feeder cattle. As security for the Cattle Note, CSB required the Nicolls to purchase a hedging contract, which was assigned to CSB.

A hedging contract is a commodity futures contract. *Leist v. Simplot* (2nd Cir. 1980) 638 F.2d 283. The trader agrees to deliver or accept delivery of a specified commodity for the price stated in the contract at some specified time in the future. Traders agreeing to deliver are in a "short" position; those agreeing to accept delivery are in a "long" position. *See generally Id.* and authorities cited therein.

"A 'hedger' is a trader with an interest in the cash market for the commodity, who deals in futures contracts as a means of transferring risks he faces in the cash market. *See* H.R.Rep. No. 93–975, *supra*, at 131, 133, 162. ... The owner of a commodity can hedge against declining prices by entering into equivalent short futures contracts for the month when he expects to be able to sell, and a processor (e.g. a miller) can hedge against increasing prices by going long for the month when he will need the commodity. Losses caused by a decline in prices on the cash market in the former case or an advance in the latter will be offset by profits in the futures transactions. *See generally* H.R.Rep. No. 93–975, *supra*, at 130–34; *Cargill, Inc. v. Hardin, supra* [8th Cir.1971], 452 F.2d [1154] at 1157–58; Note, *supra*, 73 Yale L.J. at 171–3."

*Leist, supra* at 287–88. The contract can be satisfied by delivering or accepting delivery of the commodity or by buying an equal contract in the opposite position. *Ryder Energy Distribution v. Merrill Lynch Commod.* (2d Cir.1984) 748 F.2d 774.

Nicoll purchased the hedging contract from Heinold Commodities, Inc. [Heinold]. He had been in the business of raising cattle for approximately thirty years, but had never before purchased a hedging contract. His only prior experience with the commodities market was two or three transactions involving speculation in hogs and an occasional sale of grain for future delivery. The hog transactions were made through Heinold, a commodities broker, and did not involve more than a few hundred dollars. The contract purchased by Nicoll called for the delivery of steers,[3] however Nicoll purchased ninety-nine heifers and two steers. When it came time for delivery, Nicoll could not satisfy the contract because it called for steers not heifers. Therefore, Nicoll sold the heifers on the open market over a period of time before and after the date specified in the contract. Although the record is silent, it appears the contract must have been satisfied by buying a contract for steers.

---

2. The Nalls are not parties to this action.

3. The reports from Heinold which were attached to Nicoll's deposition refer only to "cattle." The record is not clear, but it appears within the commodities market "cattle" means "steers."

During the time the contract was in effect, CSB, pursuant to its security agreement with Nicoll, advanced sums of money to Heinold to cover additional margin required by the contract. These sums were charged against the Nicolls' loan account.

In July, 1983, Nicoll asked representatives of CSB to terminate the hedging contract because it was losing money. CSB refused to do so. During the summer of 1983, the originial hedging contract expired. In August, 1983, Joe Carlson, a representative of CSB, called Heinold and requested the hedging contract be continued and Heinold complied. This appears to have required the purchase of another contract. Nicoll was unaware of this transaction and did not authorize it. Once again the record is not clear, but it appears this contract was also satisfied at a loss.

The Cattle Note, including the advances to Heinold by CSB, was paid off before CSB brought this action on the Personal Note.

## DECISION

The Nicolls allege the trial court erred in determining as a matter of law no fiduciary relationship existed between CSB and the Nicolls. The Nicolls contend there were genuine issues of material fact and the inferences to be drawn therefrom concerning the existence of a confidential relationship which gave rise to an action for constructive fraud.

■ This court has recognized a fiduciary relationship may exist between a bank and its customer "where the facts necessary to such a relationship exist." *Peoples Trust Bank v. Braun* (1983), Ind.App., 443 N.E.2d 875, 879. The relationship of bank and customer or depositor does not create a fiduciary relationship unless it can be shown a *confidential* relationship existed. *Id., See* Annot., 70 A.L.R.3d 1344.

As Judge Buchanan explained in *Hunter v. Hunter* (1972), 152 Ind.App. 365, 283 N.E.2d 775, 779:

"Although the existence of a confidential relationship depends upon the facts of each case, it can be generally stated that a confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. *Shapiro v. Rubens* (7th Cir.1948), 166 F.2d 659. Not only must there be confidence by one party in the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. *Koenig v. Leas* [240 Ind. 449, 165 N.E.2d 134 (1960) ], *supra; Koehler v. Haller* (1915), 62 Ind.App. 8, 112 N.E. 527. Further more, it must be shown that the dominant party wrongfully abused this confidence by improperly influencing the weaker so as to obtain an unconscionable advantage."

■ Although the existence of a confidential relationship is a question of fact, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions and affidavits show there is no material fact in dispute and the moving party is entitled to a judgment as a matter of law. Ind.Rules of Procedure, Trial Rule 56(C). The trial court must consider pleadings, depositions, admissions and affidavits to determine if any genuine issue of material fact exists. *Walker v. Statzer* (1972), 152 Ind.App. 544, 284 N.E.2d 127. All products of discovery must be liberally construed in favor of the non-moving party. *F.W. Means & Co. v. Carstens* (1981), Ind. App., 428 N.E.2d 251.

■ Here, in addition to the pleadings, admissions and Nicoll's affidavit, the trial court had before it Nicoll's deposition. In his deposition, Nicoll stated he did not rely on CSB for advice in determining the kind of cattle to purchase[4] or in obtaining the

---

4. "Q. Did he, [CSB's representative] did he recommend where you should buy the cattle?
A. No.
Q. Did he recommend what type of cattle you should buy?
A. No."

Q. Did he tell you whether or not you should buy steers or heifers or bulls or anything like that?
A. No.
Q. Were you looking to him for that type of advice?
A. No.

hedging contract.[5] This testimony establishes Nicoll did not repose confidence in CBS. The fact CSB required a hedging contract as security does not impose a duty upon CSB to explain the operation of such a contract, when there is no evidence Nicoll sought such advice.

In addition, Nicoll has failed to set forth specific facts showing there is a genuine issue for trial as required by T.R. 56(E). In response to the summary judgment, Nicoll filed the following affidavit:

"DONALD R. NICOLL, being first duly sworn, alleges and says:

1. That he is the Defendant in the above entitled action.

2. That the Plaintiff, Community State Bank, required Defendants to enter a Hedging Contract prior to loaning Defendants money.

3. That thereafter Plaintiff advanced sums to Heinold Commodities to cover deficiencies in this Hedging Account without prior knowledge of Defendants.

4. That said Hedging Account lost Ten Thousand Three Hundred Thirty-one Dollars and Ninety-eight Cents ($10,331.98).

5. That Defendants requested Plaintiff to discontinue the Hedging Agreement and in fact the Hedging Agreement had expired and Plaintiff's agent called Heinold and requested that the Hedging account be continued.

6. That only the Secured Party, namely the Community State Bank, could cancel the Hedging Account and they refused to do so.

7. That under the terms of the Hedging Contract only steers could be delivered by Defendants and Plaintiff, Community State Bank, should have so informed Defendants prior to Defendants buying Heifers which could not be delivered.

8. That the failure of the Plaintiff, Community State Bank, to properly advise Defendants together with the bank's refusal to cancel the Hedging Contract was the proximate cause of the loss of Ten Thousand Three Hundred Thirty-one Dollars and Ninety-eight Cents ($10,331.98) plus interest for a total loss of Eleven Thousand One Hundred Thirty-three Dollars and Seventy-two Cents ($11,133.72).

9. That the Defendants were jointly and severally liable for the Hedging losses.

10. That the loss sustained in the Hedging Contract would be more than adequate to pay the indebtedness owed the Community State Bank.

FURTHER AFFIANT SAYETH NOT.

DONALD R. NICOLL"

The affidavit contains no specific facts which indicate Nicoll relied on CSB in negotiating the hedging contract.

In addition, there was no showing Nicoll was pressured or coerced to execute the security agreement. The Nicolls contend because they needed a loan and CSB required the hedging contract as security, CSB was in a position of superiority and, in effect, coerced them to agree to the hedg-

(Supplemental record, p. 29)

5. Q. Okay, was the bank there with you? [during the negotiations for the hedging contract]
A. No.
Q. Did the bank tell you what to tell Mr. Turner? [Heinold's representative]
A. No.
Q. Did the bank write a letter to Mr. Turner instructing him how to handle the hedging contract?
A. I don't know.
Q. To your knowledge did the bank ever do that?
A. No one's told me that they had.
(Supplemental record, p. 33)
Q. Did you ever ask Mr. Carlson [CSB's representative] for assistance in going down to Heinold Commodities and entering into the hedging contract?

A. No.
Q. Did you ever tell anyone at the bank that you were not familiar with hedging contracts or cattle futures or anything of that nature and that you didn't believe you knew what you were doing?
A. No.

*   *   *   *   *   *

Q. At anytime did you ever make any statements to the Community State Bank regarding hedging contracts which should have led them to believe that you really didn't know what you were doing when you went down to Heinold Commodities to enter into those hedging contracts?
A. No.
(Supplemental record, pp. 41–42)

ing contract. We disagree. In his deposition, Nicoll states he decided to purchase cattle because he had feed available. He initiated the note transaction, not CSB. He also stated he did not contact any other lenders before agreeing to the terms of the note. The fact a lender requires a security agreement as a condition of a note does not, in itself, create a confidential relationship. *See* Annot., 70 A.L.R.3d 1344. The Nicolls were free to seek another lender if they were dissatisfied with the security agreement required by CSB; they chose not to do so. The trial court did not err in determining no confidential relationship existed.

The Nicolls also allege the trial court erred in failing to consider the tort of negligent misrepresentation. The elements of the tort of negligent misrepresentation are set out in Restatement (Second) of Torts § 552 (1977), as follows:

"One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies *false information* for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Emphasis added)

In *Eby v. York–Division, Borg–Warner* (1983), Ind.App., 455 N.E.2d 623, this court recognized the tort of negligent misrepresentation where it was alleged the employer falsely represented employment would be available to an employee if he moved to Florida. However, in *Eby* we noted the concern that recognition of the tort would raise "questions of distinguishing between actual misrepresentation and general professional negligence...." *Id.* 455 N.E.2d at 629; *See Essex v. Ryan* (1983), Ind.App., 446 N.E.2d 368. *Eby* did not present this problem, and did not extend the tort of negligent misrepresentation to include negligent professional advice. We need not do so now.

Here, the Nicolls have failed to allege any specific representation as the basis for their action. They appear to argue that requiring a hedging contract as security was a misrepresentation. Although CSB represented it would not execute the note without the hedging contract as security, there was no allegation this was a false representation. The Nicolls do not allege CSB made any representations concerning the operation of the hedging contract. The Nicolls contend CSB's failure to explain the hedging contract and inform them only steers could be delivered to fulfill the contract was a misrepresentation. However, the Nicolls do not allege CSB knew steers were required by the contract or that the Nicolls had purchased heifers. The Nicolls also argue CSB failed to inform them the hedging contract could not be cancelled, and failed to inform them it was advancing money to Heinold. However, this information was included in the security agreement executed by Nicoll. The Nicolls do not allege CSB told them anything to the contrary.

The Nicolls have failed to present specific facts showing a false representation on the part of CSB. We have held no fiduciary relationship existed between CSB and the Nicolls, therefore CSB had no duty to provide the Nicolls with advice concerning the hedging contract. The failure to give such advice cannot be regarded as a misrepresentation.

Finally, the Nicolls contend the trial court erred in granting summary judgment in favor of CSB on its complaint, when there was a counter-claim which could have operated as a set off. We have held the trial court did not err in granting summary judgment in favor of CSB on Nicolls' counter-claim. We need not discuss this issue further except to note that the Nicolls admitted all the essential elements of CSB's complaint. Therefore, there were no issues of fact in dispute and the trial court properly granted summary judgment.

AFFIRMED.

RATLIFF, C.J., and HOFFMAN, J., concur.